Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| Luz Eneida Martínez Morales y otros<br><br>*Apelantes*<br><br>v.<br><br>Kathia V. Alejandro Serrano y otros<br><br>*Apelados* | KLAN202400533 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo<br><br>Caso Núm.: AR2018CV00575 (404)<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de junio de 2025.

Comparece ante nos, la Sra. Luz Eneida Martínez Morales (Sra. Martínez o apelante); su esposo, el Sr. Abigail Quiñones Pietri y su hijo, Alexis Quiñones Martínez (en conjunto, Apelantes) mediante recurso de *Apelación* presentado el 30 de mayo de 2024, y nos solicitan que revoquemos la *Sentencia* emitida el 29 de abril de 2024, notificada al día siguiente, por el Tribunal de Primera Instancia, Sala Superior de Arecibo (TPI). En dicha *Sentencia,* el TPI desestimó la *Demanda* presentada por los Apelantes contra la Dra. Kathia V. Alejandro Serrano (Dra. Alejandro o galena) y su aseguradora, Puerto Rico Medical Defense Insurance Co. (en conjunto, Apelada) por los daños que ha sufrido debido a una alegada impericia médica.

Por los fundamentos que expondremos a continuación, ***confirmamos*** la *Sentencia* apelada.

**I.**

El 8 de octubre de 2018, la Sra. Martínez, su esposo y su hijo presentaron una *Demanda* de daños y perjuicios por impericia

médica contra la Dra. Alejandro y el Doctors' Center Hospital (DCH)[1]. En esta, reclamaron el resarcimiento de los daños que presuntamente sufrieron a raíz de las acciones y/u omisiones culposas o negligentes de la Dra. Alejandro y el DCH, relacionados a una operación de reducción de senos que la galena le realizó a la Sra. Martínez el 25 de octubre de 2016, en las facilidades del referido hospital.

Los antecedentes del caso de autos se originan en el año 2008, cuando la Sra. Martínez comenzó a sufrir dolores severos de espalda, musculares y de cabeza. En ese mismo año, la Sra. Martínez fue evaluada por su doctora de cabecera, la Dra. Norma Cruz Mendieta, en el Hospital de Veteranos, quien la diagnosticó con macromastía o hipertrofia virginal de los senos. No obstante, la Sra. Martínez no pudo operarse en el Hospital de Veteranos, ya que en dicha institución hospitalaria no se ofrecía la cirugía correspondiente de reducción de senos. Al paso de los años, la Sra. Martínez acudió a la oficina de la Dra. Alejandro, el 2 de marzo de 2016, buscando ayuda para su condición, bajo el referido del fisiatra Dr. Pablo Báez Chao, quien le había suministrado unas terapias físicas infructuosas.

En la visita del 2 de marzo de 2016, la Dra. Alejandro le ordenó realizarse una mamografía y una sonomamografía. El 6 de abril de 2016, la Sra. Martínez acudió a la oficina de la galena con los resultados de los mencionados estudios. El 19 de septiembre de 2016, la Sra. Martínez firmó un documento en las oficinas de la Dra. Alejandro en el cual certificó su consentimiento a una cirugía de reducción mamaria y también certificó entender los riesgos más probables que conlleva este procedimiento. Sin embargo, es de notar

---

[1] La causa de acción en contra de DCH y su aseguradora fue archivada luego de que las partes llegaran a un acuerdo confidencial con perjuicio. Véase, Entrada Núm. 409.

que en el documento de consentimiento no hay expresión alguna del riesgo de necrosis del complejo pezón-areola[2]. Posteriormente, el 25 de octubre de 2016, la Sra. Martínez se sometió a la cirugía de reducción de senos con la Dra. Alejandro. Según manifestó la Sra. Martínez, luego del referido procedimiento, no había vuelto a padecer de los intensos dolores musculares, de espalda y de cabeza que le aquejaban antes de la cirugía.

La mañana siguiente a la operación, el 26 de octubre de 2016, la Dra. Alejandro visitó a la Sra. Martínez por primera vez. Esa misma mañana, la Sra. Martínez le comunicó a la galena que había levantado su vendaje para ver las heridas de la cirugía y observó que, para su sorpresa, tenía el pezón de su seno izquierdo oscurecido, mientras que el derecho lucía rosado. Así, insistió a la Dra. Alejandro que verificara sus heridas. Acto seguido, la Dra. Alejandro levantó su vendaje para verificar y no notó nada particular que le preocupara. La Sra. Martínez fue dada de alta ese mismo día con instrucciones para manejar sus heridas y cita de seguimiento.

El 2 de noviembre de 2016, la Sra. Martínez acudió junto a su esposo a las oficinas de la Dra. Alejandro para la primera visita de seguimiento post operatoria. Durante esta visita, la Dra. Alejandro observó el pezón izquierdo de color azuloso gris, por lo cual, le recetó a la Sra. Martínez *Silvadene* y la instruyó a lavarse el área del complejo pezón areolar, ya que anticipó la posibilidad de desarrollar problemas de necrosis. Sin embargo, la galena no anotó sus observaciones en el récord médico de la Sra. Martínez, se limitó a anotar su receta de *Silvadene* y que las heridas estaban limpias.

El 14 de noviembre de 2016, la Sra. Martínez acudió nuevamente a las oficinas de la Dra. Alejandro para su segunda visita post operatoria. Para esta fecha, el pezón izquierdo de la Sra.

---

[2] Véase, Transcripción de la Prueba Oral (TPO) págs.40-45.

Martínez seguía oscurecido y se había formado una escara. Ante ello, la Dra. Alejandro le hizo la misma recomendación de su primera visita al recetarle *Silvadene*. En el récord médico solamente se anotó que la escara "se observa más reducida" y se hace constar la receta de *Silvadene*.

El 21 de noviembre de 2016, la Sra. Martínez acudió a su tercera cita. Durante esta visita de seguimiento, la Dra. Alejandro no cambió su plan de tratamiento, se limitó a repetirle a la Sra. Martínez la receta de *Silvadene* y sus instrucciones para lavar el área.

El 30 de noviembre de 2016, la Sra. Martínez acudió al Hospital de Veteranos y allí recibió tratamiento en la herida del complejo pezón-areola izquierdo por la enfermera licenciada Sra. Myrna Abrams, R.N. (Sra. Abrams). En esa fecha, la Sra. Abrams cambió el curso de tratamiento para la herida de la Sra. Martínez. A tales efectos, dejó de tratarse con el antibiótico Silvadene recetado por la Dra. Alejandro y comenzó un tratamiento con Santyl y gel de Duoderm.

El 7 de diciembre de 2016, la Sra. Martínez volvió a las oficinas de la Dra. Alejandro para cumplir con su cita. La nota de la galena en el récord médico para este día reza de la siguiente forma: "*Patient with clean left areolar wound with necrotic patch, with epithelization on borders. Continue local care with Silvadene. Patient went to VA and wound care given. Oriented to continue with Silvadene. Follow up in 3 weeks*".

El 14 de diciembre de 2016, la Sra. Martínez asistió a su visita de seguimiento en el Hospital de Veteranos con la Sra. Abrams, quien nuevamente limpió y trató la herida abierta de la Sra. Martínez y la necrosis en la piel de su seno izquierdo. La enfermera escribió en su nota de progreso que la escara se había liberado

completamente y que la removió. Recomendó seguir con el tratamiento recomendado por ella.

Así las cosas, el 5 de enero de 2017, la Sra. Martínez sintió un dolor más fuerte del que hasta la fecha había sentido en su seno izquierdo. Al quitarse el vendaje para revisarse, observó que la piel de su seno izquierdo se partió por debajo del pezón y comenzó a botar sangre y secreciones mal olientes. La Dra. Alejandro no la atendió ese día en sus oficinas por encontrarse de vacaciones. Al día siguiente, el 6 de enero de 2017, la Sra. Martínez acudió al Hospital de Veteranos donde fue evaluada por la Dra. Omayra Cruz y la Sra. Abrams, quienes le brindaron cuidado local en la herida. Asimismo, durante esa visita, le tomaron cultivos de la herida a la Sra. Martínez y la orientaron sobre ir a la sala de emergencias si desarrollaba fiebre o escalofríos. Conforme al expediente médico de la Sra. Martínez en el Hospital de Veteranos, los resultados de los cultivos arrojaron evidencia de las bacterias Proteus Mirabilis y Escherichia Coli.

El 9 de enero de 2017, la Sra. Martínez acudió a las oficinas de la Dra. Alejandro para informarle lo que había sucedido en el Hospital de Veteranos y pedirle que se comunicara con el Hospital. La Dra. Alejandro se comunicó con el Hospital de Veteranos para que le informaran sobre los hallazgos de los cultivos, el cuidado brindado y las recomendaciones de tratamiento de la Sra. Abrams. No obstante, la Dra. Alejandro recomendó suspender el tratamiento de la herida recomendado por la Sra. Abrams para que la herida cerrara y continuar el tratamiento con *Silvadene* exclusivamente.

Ante este marco fáctico, la Sra. Martínez asistió a las citas en el Hospital de Veteranos y a las citas de seguimiento con la Dra. Alejandro. La Sra. Martínez visitó las oficinas de la Dra. Alejandro el 19 de enero de 2017, el 9 de febrero de 2017, el 2 de marzo de 2017 y el 6 de abril de 2017. En las notas de progreso para estas citas, la

Dra. Alejandro consistentemente anotó que la herida estaba sanando.

A raíz de los hechos descritos, el 8 de octubre de 2018, los Apelantes presentaron una *Demanda* por impericia médica contra la aquí Apelada. Luego de un largo tracto procesal que resulta innecesario adentrarnos y un amplio descubrimiento de prueba, se celebró el juicio los días 16, 17, 18, 19, 23, 24, 25 y 26 de enero de 2024, así como los días 5, 6 y 7 de febrero de 2024.

Celebrado el juicio en su fondo y desfilada la prueba testifical, documental y pericial de ambas partes, el TPI emitió una *Sentencia* el 29 de abril de 2024, en la que declaró *No Ha Lugar* la *Demanda* presentada por los Apelantes. En su dictamen, el TPI hizo constar las siguientes determinaciones de hechos:

1. La Sra. Luz Martínez Morales nació el 16 de noviembre de 1955.
2. La Sra. Luz Martínez Morales se casó con el Sr. Abigaíl Quiñones Pietri el 28 de enero de 1976.
3. La Sra. Luz Martínez Morales reside en Arecibo con el Sr. Abigaíl Quiñones Pietri.
4. La Sra. Luz Martínez Morales procreó dos (2) hijos con el Sr. Abigaíl Quiñones Pietri, que se llaman Alexis Quiñones Martínez y Avinette Quiñones Martínez.
5. La Sra. Martínez Morales estudió premédica por tres (3) años, pero no terminó el grado.
6. La Sra. Martínez Morales también estudió educación, pero no terminó el grado.
7. El Sr. Abigaíl Quiñones está incapacitado del ejército desde el 1984 por los nervios, paranoia y esquizofrenia.
8. La Sra. Martínez testificó que recurrió a una operación de reducción de busto debido a que padecía de dolores de espalda, dolores musculares y dolores de cabeza severos.
9. La Sra. Martínez testificó que los dolores de espalda, dolores musculares y dolores de cabeza comenzaron en el año 2008.
10. Conforme al expediente médico de la Sra. Martínez en el Hospital de Veteranos, ella fue evaluada en el año 2008 por la Dra. Norma Cruz Mendieta, quien diagnosticó a la paciente con macromastía (bustos grandes). No obstante, la Sra. Martínez no se pudo operar en el Hospital de Veteranos ya que en dicha institución hospitalaria no se ofrecía la cirugía de reducción de senos.
11. Según el testimonio de la Sra. Martínez Morales, debido a los dolores musculares, de espalda y de cabeza que ella estaba padeciendo, tomó varias terapias físicas con el Dr. Pablo Báez, fisiatra, pero las dejó de tomar debido a que los dolores se agudizaron.
12. La Sra. Martínez testificó que acudió a la oficina de la Dra. Alejandro el 2 de marzo de 2016 buscando ayuda para su condición, que eran los dolores de espasmo, dolores de cabeza y dolores musculares severos en la espalda.

13. En la visita del 2 de marzo de 2016, la Sra. Martínez le dijo a la Dra. Alejandro sobre su condición de espalda.

14. La Sra. Martínez testificó que debido a los sufrimientos severos que le estaban causando los dolores de espalda, dolores musculares y dolores de cabeza, y que los medicamentos que estaba tomando no le estaban aliviando los dolores, la Sra. Martínez visitó al Dr. Derek Marrero, cirujano, en el año 2014.

15. La Sra. Martínez Morales testificó que no se pudo operar sus senos con el Dr. Marrero ya que no pudo llegar a un acuerdo con el plan médico para el pago de la cirugía.

16. Según el testimonio de la Sra. Martínez Morales, ella acudió a la oficina de la Dra. Alejandro Serrano el 2 de marzo de 2016 con un referido que le hizo el fisiatra, Dr. Pablo Báez, con fecha del 1 de marzo de 2016.

17. El referido del Dr. Pablo Báez lee de la siguiente manera: "Female patient with history of cervical herniated disc at C5-C6, C6-C7, disc bulge at C4-C5 and C7-T1. Patient has taken physical therapies with no improvement. She will benefit from a breast reduction surgery. Thanks".

18. La Sra. Martínez Morales admitió que en la visita del 2 de marzo de 2016 a la oficina de la Dra. Alejandro se habló únicamente sobre la cirugía de senos.

19. El 6 de abril de 2016, la Sra. Martínez acudió a la oficina de la Dra. Alejandro con la mamografía y sonomamografía que se le había ordenado en la visita anterior del 2 de marzo de 2016.

20. La Sra. Martínez Morales testificó que el 25 de octubre de 2016, antes de ser operada, la Dra. Alejandro le midió y le marcó el área de su busto.

21. La Sra. Martínez pernoctó en el Doctor's Center Hospital de Manatí del 25 al 26 de octubre de 2016. La Sra. Lorraine Monroig, esposa de Alexis Quiñones, la acompañó durante esa noche.

22. La Sra. Martínez Morales testificó que luego de haber sido dada de alta del hospital el 26 de octubre de 2016, fue a residir por aproximadamente un (1) mes a casa de su mamá, quien la cuidó durante ese periodo de tiempo.

23. La Sra. Martínez Morales testificó que luego de la mamoplastia de reducción que le hizo la Dra. Alejandro el 25 de octubre de 2016, no ha vuelto a padecer de los intensos dolores musculares, de espalda y de cabeza que le aquejaban antes de la cirugía.

24. La Sra. Martínez testificó que la cáscara o escara en su complejo pezón areolar izquierdo se iba poniendo cada vez más dura con el pasar de los días mientras usó el Silvadene.

25. La Sra. Martínez Morales testificó que acudió al Hospital de Veteranos el 30 de noviembre de 2016 y recibió tratamiento en la herida del complejo areolar izquierdo por la enfermera licenciada (Registered Nurse) Sra. Myrna Abrams, R.N., quien también tiene especialidad en el tratamiento de heridas y a esos efectos fue cualificada.

26. La Sra. Martínez Morales admitió que dejó de utilizar el Silvadene en su herida del complejo pezón areolar izquierdo a partir del 30 de noviembre de 2016.

27. La Sra. Martínez testificó que el 5 de enero de 2017 notó que la herida en su complejo pezón areolar izquierdo estaba supurando y llamó a la Dra. Alejandro, quien le devolvió la llamada y le ofreció atenderla en su oficina.

28. Conforme al testimonio de la Sra. Martínez y su expediente médico en el Hospital de Veteranos, el 6 de enero de 2017 ella acudió a dicha institución hospitalaria y fue evaluada por la Dra. Omayra Cruz y la Sra. Myrna Abrams, quien le brindó cuidado local en la herida. Asimismo, durante esa visita le tomaron cultivos de la herida a la Sra.

Martínez y la orientaron de ir a sala de emergencias si desarrollaba fiebre o escalofríos.

29. Conforme al expediente médico de la Sra. Martínez en el Hospital de Veteranos, los resultados de los cultivos arrojaron evidencia de las bacterias Proteus Mirabilis y Escherichia Coli.

30. La Sra. Martínez testificó que el 9 de enero de 2017, acudió a la oficina de la Dra. Alejandro en compañía de su nuera, Lorraine Monroig, y su esposo, Abigaíl Quiñones.

31. Conforme al expediente médico, la Sra. Martínez visitó la oficina de la Dra. Alejandro el 19 de enero de 2017.

32. Conforme al expediente médico, la Sra. Martínez visitó la oficina de la Dra. Alejandro el 9 de febrero de 2017.

33. Conforme al expediente médico, la Sra. Martínez visitó la oficina de la Dra. Alejandro el 2 de marzo de 2017.

34. Conforme al expediente médico, la última visita de la Sra. Martínez a la oficina de la Dra. Alejandro fue el 6 de abril de 2017.

35. La Sra. Lorraine Monroig tiene 52 años y está casada con Alexis Quiñones Martínez.

36. La Sra. Lorraine Monroig testificó que el 25 de octubre de 2016 llegó junto con su esposo, Alexis Quiñones, al Doctor's Center Hospital de Manatí como a eso de las 6:30 p.m.

37. La Sra. Monroig testificó que se quedó en el Doctor's Center Hospital de Manatí del 25 al 26 de octubre de 2016 acompañando a la Sra. Martínez en su habitación.

38. La Sra. Monroig testificó que acompañó a la Sra. Martínez a la visita de seguimiento a la oficina de la Dra. Alejandro el 9 de enero de 2017.

39. La Dra. Kathia Alejandro Serrano es doctora en medicina desde el año 2000. Posteriormente, hizo una residencia en cirugía general en el Recinto de Ciencias Médicas de la Universidad de Puerto Rico, en la cual recibió adiestramiento para realizar mamoplastia de reducción. En el año 2008, obtuvo un "fellowship" en el Rutgers Cancer Institute of New Jersey en cirugía de seno. El adiestramiento que obtuvo la Dra. Alejandro Serrano durante el "fellowship" estuvo dirigido a hacer las marcas pertinentes en la piel de las pacientes para poder realizar las reducciones de seno. Desde el año 2009, la Dra. Alejandro Serrano se dedica única y exclusivamente a las cirugías de seno.

40. La Dra. Alejandro Serrano, quien le mereció entera credibilidad a este Tribunal, testificó que la Sra. Martínez Morales acudió a su oficina el 2 de marzo de 2016 ya que había sido referida para una reducción de senos por el fisiatra, Dr. Pablo Báez. Durante esa visita, la Dra. Alejandro sentó a la Sra. Martínez Morales en una camilla y le palpó e inspeccionó sus senos. A raíz del examen físico, la inspección y palpación de los senos, la Dra. Alejandro diagnosticó macromastia y concluyó que aproximadamente había 1,000 gramos de exceso en cada seno de la Sra. Martínez Morales, documentándolo así en el expediente médico. Luego de que la Dra. Alejandro Serrano palpó el peso de los senos de la Sra. Martínez Morales, le dijo que una reducción del busto le ayudará con los síntomas por los cuales la refirió su fisiatra. Acto seguido, acostó a la Sra. Martínez Morales para hacerle otra evaluación. Terminada esa evaluación, la Dra. Alejandro Serrano le explicó a la Sra. Martínez Morales que el fin de la cirugía es terapéutico, o sea, lograr resolver el problema médico. La Dra. Alejandro Serrano testificó que le explicó a la Sra. Martínez cómo es la cirugía de reducción de senos. La Dra. Alejandro le dijo a la paciente que ella tiene dos (2) problemas que hay que combatir. Uno es el volumen, que tiene que ver con el peso de los senos, y el exceso de piel. Ambos aspectos contribuyen al dolor de espalda, por lo que

hay que reducir volumen, pero también hay que reducir piel. Le explicó a la Sra. Martínez Morales que su pezón estaba bien caído y hay que transferirlo a la parte de arriba del seno y esa es la parte que más reto tiene desde el punto de vista quirúrgico, pues hay que mantener vivo, vascularizado, el complejo pezón areolar. La Dra. Alejandro Serrano le dijo a la Sra. Martínez Morales que el pezón va a cambiar ya que el tamaño se va a reducir y la sensación en el pezón se va a comprometer de alguna manera por la transferencia de tejido que hay que realizar. Además, le explicó a la Sra. Martínez cómo serían las heridas de la cirugía y lo que constituye la llamada "T" invertida. Específicamente, la Dra. Alejandro Serrano le dijo que habrá una herida alrededor de la areola; otra herida en la parte baja de la areola hasta el pliegue inframamario y una herida en todo el pliegue inframamario. Luego de haberle explicado sobre la mamoplastia de reducción, la Dra. Alejandro Serrano le dijo a la Sra. Martínez Morales que, si estaba interesada en someterse a la cirugía, que regresara a la oficina con la mamografía y sonomamografía que le ordenó y así repasar cualquier duda que la paciente pudiese tener.

41. El 19 de septiembre de 2016, la Dra. Alejandro Serrano evaluó en su oficina a la Sra. Martínez Morales. El propósito de esa visita fue discutir cualquier duda que tuviera la paciente, así como recapitular y repasar todo lo relacionado a la cirugía de reducción de senos que le haría la Dra. Alejandro.

42. El documento intitulado "Consentimiento Médico Especial para Operación y Otros Tratamientos" tiene fecha del 19 de septiembre de 2016. La Dra. Alejandro Serrano testificó que estuvo presente cuando la Sra. Martínez Morales firmó dicho consentimiento y le explicó a la paciente los siguientes riesgos de la cirugía: que su pezón iba a cambiar ya que la areola iba a reducirse en tamaño; que el riesgo que conlleva la transferencia de la areola a la nueva posición puede causar cambios en el color y forma de la areola; que puede haber deformidad del seno y del complejo pezón areolar; pérdida de sensación. Además, le explicó a la Sra. Martínez Morales los riesgos comunes relacionados a cualquier procedimiento quirúrgico, que es infección, sangrado y reacciones a la anestesia. También le informó a la paciente sobre la posibilidad de necrosis en el complejo pezón areolar.

43. El 25 de octubre de 2016, en el "holding area" del Doctor's Center Hospital de Manatí, que es el área donde se encuentran las pacientes antes de pasar a la cirugía, la Dra. Alejandro Serrano le marcó y midió el busto a la Sra. Martínez Morales y volvió a repasar con ella todo lo relacionado a la mamoplastia de reducción. Luego de haber tenido esa conversación con la paciente, la Dra. Alejandro documentó, a las 7:30 a.m. de ese día, lo siguiente en el expediente médico de la Sra. Martínez Morales en el Doctor's Center Hospital de Manatí:

*Patient with severe macromastia presents with classic symptoms of back pain, posture problems, intertrigo, etc. Candidate for reduction surgery. After thorough discussion of risks vs benefits and alternatives, patient decided to go ahead with surgery. Patient instructed that I am a Breast Surgeon and the purpose of procedure been strict for treatment of her condition. Oriented about scaring, wound healing, possibility of nipple and breast deformity, in addition to usual surgical complications like bleeding, infection, reaction to anesthesia. She agreed for surgery, goal with surgery is to achieve better quality of life that is restricted at this moment due to breast size.*

44. La Dra. Alejandro Serrano testificó que le informó a la paciente la alternativa de no operarse.

45. La Dra. Alejandro Serrano le realizó una mamoplastia de reducción a la Sra. Martínez Morales el 25 de octubre de 2016. Según el reporte operatorio, la cirugía comenzó a las 9:45 a.m. y terminó a la 1:05 p.m. de ese día.

46. A la 1:45 p.m. del 25 de octubre de 2016, la Dra. Alejandro Serrano escribió un "Post-Op Note" en el expediente médico de la Sra. Martínez Morales en el Doctor's Center Hospital. Conforme al testimonio de la Dra. Alejandro, el propósito de esa nota es que cualquier galeno pueda conocer lo que se hizo con la paciente, ya que el reporte operatorio puede completarse o detallarse en un momento futuro luego de la cirugía.

47. La Dra. Alejandro preparó un "Breast Operation Report" en el cual documentó, entre otras cosas, lo siguiente:

*a. Preoperative diagnosis: Severe Macromastia (N62, M54.9)*

*b. Post Operative diagnosis: Severe Macromastia (N62, M54.9)*

*c. Time Surgery Started: 09:45*

*d. Time Surgery Ended: 13:05*

*e. Operation Performed: Reduction Mammoplasty (19318x2)*

*f. Gross Findings: severe macromastia, skin markings done upright using inverted t-incision technique, areola 42 mm, superomedial pedicle, inferolateral tissue removed.*

*g. Procedure: Under clean and sterile conditions, patient placed on supine position. After general endothracheal anesthesia, breasts cleaned and draped as usual. Approximately, 150 cc of dissecting solution were infiltrated on breast tissue. Dissecting solution was prepared by mixing 50 cc of lidocaine 1% with epinieprine in 1 L NSS. Superomedial nipple pedicle was developed by de-epithelialization. Breast incision made following skin markings made while patient was in upright position prior to induction of anesthesia using inverted T-incision technique. Inferolateral excess tissue and skin was removed, Breast tissue thoroughly irrigated, hemostasis achieved. Skin was approximated using monocryl 3-0 and 4-0.*

*h. Final Count done by: Carmen C. Rivera Del Valle*

*i. Final Count verified by: Denise M. Pérez Maldonado*

*j. Immediate Post Op Condition: stable*

*k. Estimated blood loss: 175*

48. La Dra. Alejandro Serrano testificó que decidió utilizar el pedículo superomedial en la mamoplastia de reducción que le hizo a la Sra. Martínez Morales ya que ese pedículo provee mucha irrigación sanguínea al complejo pezón areolar y cuando estaba marcando a la paciente determinó que dicha técnica le permitía mover el complejo pezón areolar de la posición en la que se encontraba a lo que sería la nueva posición en el seno de la paciente.

49. La Dra. Alejandro Serrano testificó que durante la cirugía estuvo constantemente inspeccionando y estimulando el pezón para asegurarse de la adecuacidad del flujo sanguíneo al complejo pezón areolar izquierdo de la Sra. Martínez Morales. Explicó que la respuesta normal de un pezón cuando se estimula es que se contrae y arruga, que fue lo que ocurrió en el caso del complejo pezón areolar izquierdo de la Sra. Martínez Morales.

50. El 26 de octubre de 2016, la Dra. Alejandro pasó visita por la habitación de la Sra. Martínez Morales a examinarla y evaluarla. Según el testimonio de la Dra. Alejandro, la Sra. Martínez Morales se encontraba bien y estaba responsiva. La Sra. Martínez le indicó que durante la noche anterior había notado su pezón izquierdo negro. La Dra. Alejandro procedió a levantarle lo menos posible el vendaje a la paciente para verle las heridas y notó que el complejo pezón areolar izquierdo de la Sra. Martínez Morales estaba rosado. Ese día,

a las 10:57 a.m., la Dra. Alejandro documentó un "Breast Surgery Progress Note" en el expediente médico de la paciente en el Doctor's Center Hospital de Manatí. Escribió lo siguiente:

*Subjective data: S/P Reduction Mamoplasty*

*Objective: Physical Examination: Clean wound (Reduction Mamoplasty)*

*Pain Present: Yes (post surgery)*

*Pain intensity: 3-4 Moderate pain*

*Assessment/Plan: Pt feeling well, no complains, adequate vital signs, bandages are in place. D/H and follow up in 1 week.*

La Dra. Alejandro dio de alta a la Sra. Martínez Morales ese día, 26 de octubre de 2016, con cita de seguimiento en una semana. La Sra. Martínez Morales testificó que fue dada de alta con instrucciones.

51. El 2 de noviembre de 2016, la Sra. Martínez Morales acudió a la oficina de la Dra. Alejandro, quien marcó en el expediente médico que las heridas estaban limpias. Durante esa visita, la Dra. Alejandro Serrano testificó que le recetó Silvadene a la Sra. Martínez Morales porque ese día notó que el pezón izquierdo de la paciente estaba de color azul-gris y anticipó que habría un problema de necrosis parcial o completa en esa área. La Dra. Alejandro le explicó a la Sra. Martínez Morales que el complejo pezón areolar izquierdo se iba a poner cada vez más oscuro hasta que se pusiera negro y eventualmente se formaría una escara necrótica. La Dra. Alejandro Serrano le dijo a la Sra. Martínez Morales que, si ese pezón se perdía o se moría la piel del complejo pezón areolar, el área tardaría mucho tiempo en cicatrizar. Por esa razón, la Dra. Alejandro instruyó a la paciente a que se lavara el área del complejo areolar izquierdo con agua, jabón antibacterial sin perfume, secara el área y se colocara el Silvadene cuando se le formara el parcho necrótico. Asimismo, la Dra. Alejandro Serrano le dijo a la Sra. Martínez Morales que regresara a la oficina en una (1) semana.

52. Del testimonio de la Dra. Alejandro Serrano, se desprende que fue en la visita post-operatoria del 14 de noviembre de 2016 que ella vio, por primera vez, que la Sra. Martínez tenía una escara en el complejo pezón areolar izquierdo. El resto de las heridas estaban bien y no había secreciones en las mismas. En esa visita, la Dra. Alejandro Serrano le volvió a recetar Silvadene a la paciente y la instruyó a que regresara a la oficina en dos (2) semanas.

53. La Dra. Alejandro testificó que nunca se le notificó que hubo un cambio en manejo y tratamiento el 30 de noviembre de 2016 cuando la Sra. Martínez fue al Hospital de Veteranos.

54. Sobre la visita post-operatoria de la Sra. Martínez el 7 de diciembre de 2016, la Dra. Alejandro Serrano testificó que documentó lo siguiente en el expediente médico de su oficina: *Patient with clean left areolar wound with necrotic patch with epithelialization on borders, continue local care with Silvadene. Patient went to VA and wound care given, oriented to continue with sylvadene. Follow up in 3 weeks.* Según la Dra. Alejandro, *"with epithelialization"* significa que los bordes de la herida de la Sra. Martínez Morales habían comenzado a sanar.

55. La Dra. Alejandro testificó que en la visita post-operatoria del 7 de diciembre de 2016 se percató que los vendajes de la Sra. Martínez se veían diferentes a lo que ella había recomendado y orientó a la Sra. Martínez de que continuara con el tratamiento establecido en su clínica: agua, jabón antibacterial sin perfume, que se secara el exceso cuando saliera del baño, se untara bastante Silvadene para evitar el aumento del contaje de bacterias, gasa y utilizara su brasier

ajustado. Asimismo, le dijo que no usara el Santyl y se dejara el parcho necrótico como un vendaje biológico con el propósito de que cubra el proceso de sanación que está ocurriendo en los tejidos subyacentes. La Dra. Alejandro Serrano le explicó a la Sra. Martínez Morales que lo que ella iba a esperar con el proceso de sanación de esa herida es similar a lo que ocurre con una herida en la rodilla, en la cual la cáscara se pone dura, se levanta y se cae cuando el tejido que está debajo cicatrizó.

56. La Dra. Alejandro testificó que en la visita post-operatoria del 9 de enero de 2017, ella documentó lo siguiente en el expediente médico de la Sra. Martínez Morales:

*Patient with left areolar necrotic patch diminishing size. Had an episode of drainage through area lower to areola, at this moment is cleaned and closed. Case discussed with Mrs. Abrahams and Dr. Omayra Cruz. Cultures P. Mirabilis sus. Septra, E. Coli susp. Cipro. Will cover with antibiotics. Chest CT negative for any breast collections. Patient reassure, continues local care as recommended by wound specialist Mrs. Abrahams. Return to clinic in 1 week.*

La Dra. Alejandro testificó que no estuvo de acuerdo con la recomendación de la Sra. Abrams de cambiarle el Silvadene por el Santyl. Sobre la oración "Patient reassure, continues local care as recommended by wound specialist Mrs. Abrahams.", la Dra. Alejandro testificó que escribió lo anterior haciendo referencia a que la Sra. Martínez Morales se sentía cómoda limpiándose la herida con la Sra. Abrams, pero que su recomendación y tratamiento de usar el Silvadene no había cambiado.

57. La Dra. Alejandro testificó que el 9 de enero de 2017 tuvo una conversación telefónica con la Dra. Omayra Cruz a raíz de que la Sra. Martínez se había quejado que estaba botando unas secreciones y la atendieron en el Hospital de Veteranos, donde le hicieron unos cultivos. La Sra. Martínez llegó preocupada con los cultivos a la oficina de la Dra. Alejandro, a quien le solicitó que llamara a la enfermera (Myrna Abrams) y a su médico de cabecera (Dra. Omayra Cruz). Entonces, la Dra. Alejandro habló con la Dra. Omayra Cruz y le expresó que le preocupaba que hayan eliminado el Silvadene, que es una crema antibiótica, y la sustituyeran por Santyl Colagenasa, que es una crema que desbrida químicamente y no tiene ningún efecto antibiótico, causando que aumente la cantidad de bacterias en la herida. Con el propósito de bajar el contaje de bacterias que tenía la Sra. Martínez, decidieron cubrirla con antibióticos que cubrieran las bacterias Proteus y Escherichia.

58. El Dr. Méndez López nació el 12 de agosto de 1965. Obtuvo el grado de doctor en medicina en el año 1990. Posteriormente, hizo una residencia en cirugía general durante cinco (5) años y luego cursó dos (2) años adicionales para obtener un fellowship en cirugía plástica y reconstructiva. Desde el año 1997 es cirujano plástico y está licenciado para practicar la medicina en Puerto Rico y en el estado de la Florida, donde reside actualmente. En el año 2019 recertificó al American Board of Plastic Surgery.

59. El Dr. Méndez López reconoció que la necrosis del complejo pezón areolar es una complicación remota que solo ocurre en 1-2% de los pacientes que se someten a una mamoplastia de reducción.

60. El Dr. Méndez López reconoció que un cirujano tiene varias alternativas quirúrgicas para hacer una mamoplastia de reducción, entre ellas, el pedículo superior medial.

61. El Dr. Méndez López aseveró que el pedículo superior medial está reconocido dentro del campo de la cirugía como una técnica aceptable, adecuada y confiable para realizar una mamoplastia de reducción.

62. El Dr. Méndez López reconoció que escoger la técnica quirúrgica para una mamoplastia de reducción es una decisión médica basada en el entrenamiento del médico, en la evaluación preoperatoria de la paciente y en cuán cómodo se siente ese médico en utilizar dicha técnica.

63. El Dr. Méndez López reconoció que la necrosis del complejo pezón areolar puede ocurrir en cualquier diseño, pedículo o técnica operatoria que se utilice para una reducción de seno.

64. El Dr. Méndez López admitió que la evaluación de la perfusión o circulación adecuada en el complejo pezón areolar por parte del cirujano durante una mamoplastía de reducción tiene un componente de juicio clínico.

65. El Dr. Méndez López testificó que en la mayoría de las ocasiones se utiliza la técnica de t invertida para realizar una mamoplastia de reducción.

66. El Dr. Méndez López testificó que el pezón es lo que sobresale y la areola es lo que rodea el pezón.

67. Del testimonio del Dr. Méndez López se desprende que la isquemia es la falta de circulación adecuada a un tejido.

68. Del testimonio del Dr. Méndez López se desprende que la necrosis es el resultado final de la isquemia, cuando no hay circulación y muere el tejido.

69. El Dr. Méndez López reconoció que la epinefrina se utiliza para minimizar el sangrado en una cirugía, que puede ser una complicación mortal.

70. El Dr. Méndez López admitió efecto de la epinefrina en el cuerpo humano puede durar entre 30-60 minutos y para que un complejo pezón areolar sufra de isquemia necesita estar muchas horas sin recibir sangre.

71. El Dr. Méndez López reconoció que es adecuado utilizar la epinefrina en mamoplastias de reducción.

72. El Dr. Méndez López reconoció que la necrosis del complejo pezón areolar puede ocurrir independientemente de la técnica quirúrgica que se utilice para una mamoplastia de reducción.

73. El perito de la parte demandante, Dr. Roberto Juan Méndez, admitió que la necrosis en el complejo pezón areolar luego de una mamoplastia de reducción puede ocurrir en las mejores manos de un cirujano.

74. El Dr. Méndez López admitió que desconoce cuándo se vio la necrosis en el seno de la Sra. Martínez.

75. El Dr. Méndez López reconoció que no existe evidencia de que el pedículo se haya torcido en la cirugía.

76. El Dr. Méndez López reconoció que no existe evidencia en el expediente médico de que haya habido alguna complicación durante la cirugía.

77. El Dr. Méndez López reconoció que ordenar un antibiótico tópico y que se lave con agua y jabón es un tratamiento adecuado y aceptado por la comunidad médica.

78. El Dr. Méndez López reconoció que el Silvadene se utiliza para el manejo de necrosis del complejo pezón areolar y es un tratamiento adecuado.

79. El Dr. Méndez López reconoció que dar citas de seguimiento para observar cómo evoluciona el proceso de sanación es un tratamiento adecuado y aceptado por la comunidad médica.

80. El Dr. Méndez López reconoció que no sacar la escara o cáscara y esperar a que se separe por su proceso natural es un tratamiento adecuado y aceptado por la comunidad médica.

81. El Dr. Méndez López testificó que una paciente debe seguir las recomendaciones del cirujano.

82. El Dr. Méndez López testificó que el tratamiento que le brindaron a la Sra. Martínez en el Hospital de Veteranos era distinto al que le estaba dando la Dra. Alejandro.

83. El Sr. Quiñones Pietri nació el 19 de noviembre de 1951 y está casado con Luz Martínez Morales.

84. El Sr. Quiñones Pietri testificó que, a eso de las 6:10 a.m. del 25 de octubre de 2016, llevó a su esposa, la Sra. Martínez, al Doctor's Center Hospital de Manatí para una cirugía que ella se iba a hacer en los senos.

85. Del testimonio del Sr. Quiñones Pietri se desprende que él permaneció en el Doctor's Center Hospital de Manatí mientras operaban a la Sra. Martínez el 25 de octubre de 2016.

86. El Sr. Quiñones Pietri testificó que vio a la Sra. Martínez el día de la cirugía, como a eso de las 4:00 p.m. Estuvo un rato con su esposa y se fue para su casa en Arecibo como a las 7:00 p.m.

87. El Sr. Quiñones Pietri testificó que el 26 de octubre de 2016 fue con su hijo Alexis Quiñones al Doctor's Center Hospital de Manatí a buscar a su esposa, la Sra. Martínez.

88. La Sra. Myrna Abrams, R.N. es enfermera y especialista en curación de heridas desde el año 1988. Para la fecha de los hechos, era la supervisora de la Clínica de Manejo de Piel y Heridas en el Hospital de Veteranos. En cuanto al manejo de pacientes, la Sra. Abrams, R.N., se encargaba de hacer la evaluación inicial, de realizar un examen físico, darle cuidado y determinar el plan de acción.

89. La Sra. Abrams, R.N., tenía privilegios extendidos en el Departamento de Cirugía del Hospital de Veteranos y hacía recomendaciones de cuidado, las cuales enviaba al médico primario que le consultó el paciente y quien tenía que aprobar las mismas.

90. La Sra. Abrams, R.N., testificó que la Sra. Martínez le fue consultada por la Dra. Omayra Cruz del Hospital de Veteranos.

91. La Sra. Myrna Abrams, R.N., admitió que el 30 de noviembre de 2016 recomendó cambiar el tratamiento médico que estaba recibiendo la Sra. Martínez Morales con la Dra. Alejandro.

92. La Sra. Myrna Abrams, R.N, admitió que el 30 de noviembre de 2016 le recomendó a la Sra. Martínez Morales que dejara de utilizar el Silvadene, el cual había sido ordenado por la Dra. Alejandro.

93. La Sra. Abrams, R.N., le recetó Santyl a la Sra. Martínez el 30 de noviembre de 2016 con el propósito de debridar la herida.

94. La Sra. Abrams, R.N., admitió que, a pesar de que tenía conocimiento de la recomendación dada por la Dra. Alejandro el 9 de enero de 2017 de detener el tratamiento de curación de heridas que se le estaba dando a la Sra. Martínez Morales en el Hospital de Veteranos, ella continuó dándole tratamiento a la paciente los siguientes días: 18 de enero de 2017; 8 de febrero de 2017; 22 de febrero de 2017 y 13 de marzo de 2017. Finalmente, el 31 de mayo de 2017, le dio de alta a la Sra. Martínez Morales.

95. El Sr. Alexis Quiñones Martínez nació el 7 de junio de 1977.

96. El Sr. Quiñones Martínez tiene un bachillerato en comunicaciones y es maestro del programa de Educación Especial en la Escuela Antonio Lucchetti.

97. El Sr. Quiñones Martínez testificó que el 25 de octubre de 2016 fue junto con su esposa, la Sra. Monroig, a visitar a su madre, la Sra. Martínez, al Doctor's Center Hospital de Manatí. Él se quedó en el hospital como hasta las 8:00 p.m. de ese día.

98. El Sr. Quiñones Martínez testificó que vio a su madre el próximo día, 26 de octubre de 2016. Ese día fue al Doctor's Center Hospital de Manatí con su papá, el Sr. Quiñones Pietri, a buscar a su esposa, la Sra. Monroig, y a su mamá.

99. El Sr. Quiñones Martínez testificó que luego de buscar a su esposa y a su mamá al Doctor's Center Hospital de Manatí se dirigió a casa de su abuela, que era quien iba a cuidar a su mamá. Una vez llegaron a la casa, bajaron a la Sra. Martínez del vehículo y procedieron a acostarla en la cama. Él habló un rato con ella y luego se fue.

100. La Sra. Elivette Díaz Torrado ("Sra. Díaz") reside en El Paso, Texas, Estados Unidos, y es ama de casa.

101. La Sra. Díaz testificó que trabajó con la Dra. Alejandro desde aproximadamente el año 2007 hasta el año 2020, cuando fue despedida por la Dra. Alejandro.

102. La Sra. Díaz testificó que sus funciones al atender las llamadas que recibía de las pacientes de la oficina de la Dra. Alejandro eran, mayormente, dar citas iniciales y de seguimiento.

103. La Sra. Díaz testificó que nunca le dijo a una paciente que tomara algún antibiótico o que acudiera a una sala de emergencia.

104. La Dra. Alejandro ofreció como prueba pericial al Dr. Bolívar Arboleda Osorio y al Dr. Humberto Guiot.

105. El Dr. Bolívar Arboleda Osorio es doctor en medicina, con especialidad en cirugía general, desde el año 1988. Es Board Certified en cirugía general y desde el año 2013 se dedica única y exclusivamente a la mastología, que es una división de la cirugía general que trata las afecciones de los senos, tanto en la parte oncológica como no oncológica. También es miembro del American College of Surgeons del capítulo de Puerto Rico y profesor asistente en la Universidad Central del Caribe desde el año 2004, cuya función es entrenar a los estudiantes de medicina de tercer año en la disciplina clínica de la mastología, que comprende enseñar lo que es un examen apropiado de los senos, las afecciones más comunes de los senos y los tratamientos más comunes que se utilizan para tratar esas afecciones. El Dr. Arboleda Osorio es attending surgeon en el Hospital HIMA San Pablo de Caguas desde el 1988 y sus tareas son el manejo clínico de las pacientes que ve en su oficina, en la sala de operaciones y, en algunas ocasiones, en situaciones de emergencia. El Dr. Arboleda Osorio tiene privilegios para atender pacientes en el Hospital HIMA San Pablo Caguas, ahora Hospital Pavía Caguas, Professional Hospital de Guaynabo y en el Hospital Oncológico del Centro Médico de Río Piedras.

106. El Dr. Arboleda Osorio, quien nos mereció entera credibilidad y mayor valor probatorio que el perito de la parte demandante, testificó que, luego de haber examinado todos los documentos nombrados en su informe pericial, concluyó que todas las actuaciones de la Dra. Alejandro Serrano fueron adecuadas, basadas en un análisis de lo que es la práctica correcta de la medicina al momento de los hechos, así como el conocimiento médico existente a esa fecha y su experiencia como cirujano por más de treinta (30) años.

107. Según el testimonio del Dr. Arboleda Osorio, los riesgos comunes de una mamoplastia de reducción son sangrado, infección y cicatrización. En cambio, la necrosis es un riesgo remoto que solamente ocurre en el 1-2% del total de los casos de mamoplastia de reducción. Además, el Dr. Arboleda Osorio testificó que la necrosis del complejo pezón areolar en una mamoplastia de reducción es imposible de prevenir, independientemente del pedículo que se utilice. Mediante un dibujo que preparó durante su testimonio y el cual se marcó como Exhibit 11 estipulado, le ilustró al Tribunal la razón por la cual la necrosis no se puede prevenir ni predecir en una mamoplastia de reducción.

108. Según el testimonio del Dr. Arboleda Osorio, la perfusión arterial del complejo pezón areolar es la cantidad

de sangre de la arteria que llega hasta ese punto. No existe una técnica específica para medir la presión arterial a nivel del complejo pezón areolar, sino que se trata de un asunto de impresión clínica del cirujano durante la cirugía, quien podrá tener un indicio de una disminución en la irrigación arterial si el tejido cambia significativamente de color.

109. El Dr. Arboleda Osorio testificó que el propósito de utilizar la epinefrina durante una cirugía es disminuir el riesgo de sangrado. El efecto de la epinefrina en el cuerpo humano puede durar entre 30-60 minutos y para que un complejo pezón areolar sufra de isquemia necesita estar muchas horas sin recibir sangre.

110. El Dr. Arboleda Osorio testificó que una vez la media vida de la epinefrina (30-60 minutos) se extingue, los vasos sanguíneos que se contrajeron por la epinefrina vuelven a su estado normal. Es decir, luego de esos 30-60 minutos, la irrigación arterial vuelve a ser la misma que había antes de inyectar la epinefrina. Por lo tanto, está en desacuerdo con el Dr. Méndez, perito de la parte demandante, quien testificó que la epinefrina pudo haber contribuido a la isquemia del complejo pezón areolar izquierdo de la Sra. Martínez Morales.

111. El Dr. Arboleda Osorio testificó que no hay forma de que horas después de la cirugía el pezón izquierdo de la Sra. Martínez estuviera "bien negro" como la paciente declaró, ya que la isquemia del complejo pezón areolar es un proceso gradual mediante el cual el tejido va perdiendo circulación y sufriendo cambios, que usualmente comienzan a ocurrir de 2-4 días después de la cirugía.

112. Según el testimonio del Dr. Arboleda Osorio, las alternativas de tratamiento no quirúrgicas que tenía la Sra. Martínez Morales para tratar sus problemas cervicales y severos dolores musculares, de espalda y de cabeza, eran las siguientes: uso de medicamentos, inyecciones y/o terapias físicas. La Sra. Martínez Morales había agotado todas esas alternativas al momento en que visitó la oficina de la Dra. Alejandro el 2 de marzo de 2016.

113. Según el testimonio del Dr. Arboleda Osorio, a quien este Tribunal le dio entera credibilidad, no existe una contraindicación absoluta para utilizar un pedículo superior medial en una mamoplastia de reducción. Sin embargo, sí existen contraindicaciones relativas para llevar a cabo una mamoplastia de reducción utilizando el pedículo superior medial. Una de ellas es cuando una paciente ha tenido una operación de corazón abierto (open heart surgery) y le utilizaron la arteria mamaria interna para revascularizar el corazón, ya que esa es la arteria que le provee la circulación sanguínea al pedículo superior medial. Otras contraindicaciones relativas importantes que pueden afectar la irrigación sanguínea de cualquier tipo de pedículo, incluyendo el superior medial, son aquellas pacientes fumadoras activas, que tengan con diabetes descontrolada, que hayan recibido radioterapia y pacientes que tengan tejido colágeno. La Sra. Martínez Morales no tenía ninguna de esas contraindicaciones para la fecha en que la Dra. Alejandro le realizó la mamoplastia de reducción el 25 de octubre de 2016. El Dr. Arboleda Osorio testificó que la edad de la Sra. Martínez, sesenta (60) años al momento de la mamoplastia de reducción que le hizo la Dra. Alejandro, no era un factor de riesgo para la cirugía ni para utilizar el pedículo superior medial. Esto pues, la microcirculación disminuida en un seno no depende de la edad, tal y como testificó el perito de la parte demandante, sino por las condiciones patológicas que pudiese tener la paciente, como, por ejemplo, ser fumadora activa, padecer de diabetes descontrolada y/o arterosclerosis severa. No se desfiló

prueba que estableciera que la Sra. Martínez tuviera o padeciera de alguna de esas condiciones.

114. El Dr. Arboleda Osorio le ilustró al Tribunal, a través de dibujos que preparó durante su testimonio en sala (Exhibit 10 estipulado), que cuando se construye un pedículo se consideran dos (2) aspectos importantes: el ancho y largo del pedículo. Explicó que un concepto básico que se utiliza en la cirugía es la proporción o ratio de 3:1, que es el largo del pedículo versus el ancho del pedículo. Por lo tanto, si el pedículo tiene una medida de 10 cm de ancho, el largo del pedículo puede llegar hasta 30 cm. Por consiguiente, si una paciente tiene una medida desde el ángulo supraesternal de 30 cm, se utilizaría un pedículo cuyo ancho sea de 10 cm. Así también, si el pedículo tiene un ancho de 15 cm, se puede llegar hasta 45 cm de largo en ese pedículo. Por tal razón, testificó el Dr. Arboleda Osorio, dicho pedículo permite mantener una longitud mayor con una buena irrigación arterial, por lo que no es correcto afirmar, tal y como testificó el perito de la parte demandante, que en este caso la Dra. Alejandro Serrano no debió haber utilizado el pedículo superior medial debido a la distancia que había que mover el complejo pezón areolar de la Sra. Martínez Morales.

115. El Dr. Arboleda Osorio testificó que el tipo de pedículo que se va a utilizar para realizar una mamoplastia de reducción es una determinación clínica del cirujano basada en varios factores, entre ellos, la experiencia del cirujano, el tipo de tejido que tiene el seno, el tamaño del seno y la longitud del pedículo.

116. Del testimonio del Dr. Arboleda Osorio se desprende que haber cambiado un pedículo superior medial a la técnica de injerto libre de pezón o "free nipple technique" durante la cirugía, como señaló el Dr. Méndez López, no hubiese evitado la necrosis en el complejo pezón areolar izquierdo de la Sra. Martínez. Esto pues, el pezón se puede necrosar en cualquiera de las técnicas quirúrgicas que se utilicen en una mamoplastia de reducción.

117. El Dr. Arboleda Osorio testificó e ilustró al Tribunal mediante dibujo realizado por él durante su testimonio (Exhibit 11 estipulado), que no es posible prevenir la necrosis en ninguna técnica quirúrgica para una reducción de senos. Explicó que un pedículo, cualquiera que sea, se hace cortando a través de tejido. El cirujano realiza esos cortes basándose en la anatomía arterial más común que tienen casi todas las pacientes. No obstante, entre el 1-2% de las pacientes tienen una variante particular en la anatomía arterial y no existe estudio alguno que diga dónde exactamente están cada una de las ramas arteriales. Por lo tanto, si resulta que la paciente tiene esa variación anatómica, que no hay manera de saberlo, una de las ramas arteriales se verá afectada por el corte que se hizo, causando que no llegue circulación al tejido y eventualmente muera.

118. Según el testimonio del Dr. Arboleda Osorio, los requisitos básicos que debe tener un reporte operatorio son los siguientes: a) diagnóstico preoperatorio; b) diagnóstico postoperatorio; c) procedimiento realizado; d) hallazgos; e) descripción de la cirugía; f) pérdida de sangre en la cirugía y; g) contaje de instrumentos. Por ello, concluyó que el reporte operatorio preparado por la Dra. Alejandro cumplió con todos los mencionados requisitos.

119. El Dr. Arboleda Osorio testificó que la visita de la Dra. Alejandro Serrano el 26 de octubre de 2016 fue completamente adecuada para lo que viene siendo la primera visita postoperatoria ya que el "Breast Surgery Progress Note" de la doctora contiene los signos vitales de la paciente de ese día, lo que ella observó en la Sra. Martínez y el plan

para con la paciente, que fue darla de alta y darle cita de seguimiento en una semana, que es lo adecuado luego de una mamoplastia de reducción.

120. Según el Dr. Arboleda Osorio, quien, como indicamos anteriormente, le mereció entera credibilidad a este Tribunal y mayor valor probatorio que el testimonio del perito de la parte demandante, la Dra. Alejandro Serrano manejó correctamente la necrosis del complejo pezón areolar izquierdo de la Sra. Martínez Morales. El Dr. Arboleda Osorio explicó que el manejo de la necrosis en el complejo pezón areolar es evitar una infección y darle oportunidad a que el complejo pezón areolar llegue a su máximo de necrosis, que puede ser total o parcial. A través de un dibujo que realizó en sala durante su testimonio y el cual se marcó como Exhibit 12 estipulado, explicó que el proceso natural de sanación se da en dos (2) dimensiones: de adentro hacia afuera y de forma concéntrica. Mientras el pezón y la areola se están necrosando, los tejidos que están debajo, subyacentes, están sanando al mismo tiempo. Por lo tanto, en el proceso de curación en este tipo de heridas, lo que se hace es mantener la escara en el sitio y sin infección para que pueda ocurrir la sanación interna. Cuando ese proceso concluye, el cuerpo expulsa la escara, la cual, usualmente, se cae sola dentro de un periodo de 3-4 meses. Ahora bien, si por alguna razón ese proceso se retrasó y la parte interna sanó, pero la escara no se ha caído, entonces se puede considerar debridar o remover la escara.

121. El Dr. Arboleda Osorio testificó que el Silvadene es un antibiótico tópico que se utiliza en situaciones de falta de circulación en el complejo pezón areolar con el propósito de disminuir la cantidad de bacterias y evitar que se desarrolle una infección en esa área.

122. El Dr. Arboleda Osorio testificó que el tratamiento que le brindó la Sra. Myrna Abrams a la Sra. Martínez Morales en el Hospital de Veteranos consistió en quitarle químicamente la escara a la paciente antes de tiempo. El efecto que eso tuvo fue que la escara se cayó muy rápido y no permitió que se completara la sanación de adentro hacia afuera. Utilizando el Exhibit 12 estipulado, el Dr. Arboleda Osorio ilustró al Tribunal que cuando hay una herida abierta, se crean una serie de células que son las responsables de la sanación de la herida. Entonces, esas células comenzarán a ocupar el espacio que haya disponible. Si ese espacio es hacia adentro, esas células irán creciendo e irán formando una cavidad. En cambio, si la herida cierra completa de adentro hacia afuera, cuando eventualmente se caiga la escara, ya no habrá ningún espacio que rellenar porque el cuerpo lo rellenó. Por lo tanto, el tratamiento brindado por la Sra. Abrams, R.N., a la Sra. Martínez Morales tuvo una consecuencia detrimental ya que, al haberle quitado la escara, el borde de la herida superior sanó hacia adentro y no de forma llana, como debió haber sanado si se dejaba la escara hasta que se cayera sola.

123. Del testimonio del Dr. Arboleda Osorio se desprende que la Santyl colagenasa causa unos cambios químicos debajo de la escara. El tratamiento que le brindó la Sra. Myrna Abrams, R.N., a la Sra. Martínez Morales en el Hospital de Veteranos consistió en quitarle químicamente la escara a la paciente antes de tiempo. El efecto que eso tuvo fue que la escara se cayera muy rápido y no dio oportunidad a que la sanación de adentro hacia afuera se hubiese dado completamente. Ese tratamiento de herida que le dio la Sra. Abrams, R.N., en el Hospital de Veteranos tuvo un efecto detrimental porque al quitarle la escara, el borde de la herida superior va a comenzar a sanar hacia adentro. La razón de ello es que cuando hay una herida abierta se van creando

una serie de células que hacen que una herida sane. Esas células van a comenzar a ocupar el espacio que haya disponible. Si ese espacio es hacia adentro, esas células irán creciendo e irán formando una cavidad. En cambio, si la herida cierra completa de adentro hacia afuera, cuando eventualmente se caiga la escara, ya no habrá ningún espacio que rellenar porque el cuerpo lo rellenó.

124. Del testimonio del Dr. Arboleda Osorio se desprende que la Dra. Alejandro Serrano quiso evitar una infección al haberle ordenado Silvadene 1% a la Sra. Martínez Morales y haberle instruido a que se lavara la herida con agua y jabón. Además, le dio la oportunidad al complejo pezón areolar a que llegara a su máximo de necrosis, se formara la escara, sanara la parte interna en su totalidad y, finalmente, se cayera la escara.

125. El Dr. Arboleda Osorio testificó que todas las visitas postoperatorias que le dio la Dra. Alejandro Serrano a la Sra. Martínez Morales fueron completamente apropiadas. Declaró que lo usual y adecuado es que la primera visita luego de una mamoplastia de reducción debe ser una semana después de la cirugía, tal y como lo hizo la Dra. Alejandro Serrano con la Sra. Martínez el 2 de noviembre de 2016. Asimismo, es usual y adecuado que la segunda visita postoperatoria se programe para aproximadamente dos (2) semanas después, que fue lo que hizo la Dra. Alejandro Serrano cuando vio a la Sra. Martínez Morales el 14 de noviembre de 2016. Luego de esa visita, el seguimiento adecuado de una paciente luego de una mamoplastia de reducción es cada 3-6 meses. No obstante, como la Dra. Alejandro identificó que había un problema en el complejo pezón areolar izquierdo de la Sra. Martínez Morales, le dio citas de seguimiento en forma regular, que fueron las siguientes: 7 de diciembre de 2016; 9 de enero de 2017; 19 de enero de 2017; 9 de febrero de 2017; 2 de marzo de 2017 y; 6 de abril de 2017.

126. El Dr. Arboleda Osorio testificó que refrescar bordes significa cortar los bordes de la herida que ha ido cerrando con la intención de ampliar el área y que sane mejor. La Sra. Martínez se hubiese beneficiado de que la herida sanara de adentro hacia afuera antes de que se sellara y no se invirtiera el proceso.

127. El Dr. Arboleda Osorio testificó que los senos de una paciente que se va a someter a una mamoplastia de reducción se miden en algún momento antes de la cirugía y no necesariamente en la primera o segunda evaluación.

128. El Dr. Humberto Guiot nació el 3 de agosto de 1976 y obtuvo el grado de doctor en medicina en el año 2001 de la Universidad de Puerto Rico, Recinto de Ciencias Médicas. Posteriormente, hizo una residencia en medicina interna del 2001 al 2004 en la Universidad de Puerto Rico, Recinto de Ciencias Médicas. Luego, del 2004 al 2006, hizo una subespecialidad en enfermedades infecciosas en la Universidad de Puerto Rico, Recinto de Ciencias Médicas. Es Board Certified en medicina interna y en enfermedades infecciosas.

129. El Dr. Guiot es profesor del programa de enfermedades infecciosas de la Universidad de Puerto Rico y su rol es supervisar a los residentes que están haciendo la subespecialidad en enfermedades infecciosas. Asimismo, da clases en el programa de doctor en medicina en segundo y tercer año. Recibe también estudiantes de cuarto nivel del programa de doctorado en medicina.

130. El Dr. Guiot tiene privilegios en el Hospital Universitario de Adultos (UDH); en la Sala de Emergencias de ASEM; en el nuevo hospital del Centro Comprensivo de Cáncer de la

Universidad de Puerto Rico; y en el Hospital HIMA San Pablo, ahora Hospital Español Auxilio San Pablo.

131. La encomienda del Dr. Guiot en el caso fue dar su opinión pericial sobre los cultivos positivos que se le tomaron a la Sra. Martínez el 5 de enero de 2017 en el Hospital de Veteranos y sobre el manejo de la herida que se le brindó a la paciente en el Hospital de Veteranos.

132. El Dr. Guiot testificó que la necrosis que sufrió la Sra. Martínez en su complejo pezón areolar izquierdo no fue secundaria a un proceso infeccioso.

133. El Dr. Guiot testificó que una infección es un proceso causado por un germen, que puede ser un virus, una bacteria o un hongo, y que genera una patología, en este caso, en un ser humano.

134. El Dr. Guiot testificó que una infección se diagnostica dependiendo del tipo de infección y el germen que lo esté causando. Las infecciones localizadas, como las de piel, se diagnostican tomando en consideración los signos y síntomas que presente la paciente.

135. Del testimonio del Dr. Guiot se desprende que las infecciones de heridas quirúrgicas son extremadamente raras a menos de 48 horas luego de la cirugía. Usualmente, las infecciones de heridas quirúrgicas surgen después de la primera semana luego de la cirugía y hasta los primeros treinta (30) días. Se diagnostican por un enrojecimiento marcado del área, que tiene que ser mayor de 5 cm, calor en el área, purulencia, y que la herida se abra espontáneamente. También pueden surgir signos en el cuerpo, como fiebre (temperatura mayor de 38°C), escalofríos, malestar general, síntomas gastrointestinales (náuseas, vómitos y diarreas), taquicardia y presiones disminuidas (menor de 90/60). A las 24 horas luego de la cirugía y cuando fue dada de alta, la Sra. Martínez ninguno de esos signos y síntomas que pudiesen sostener que tenía un proceso infeccioso agudo.

136. Del testimonio del Dr. Guiot, quien le mereció entera credibilidad a este tribunal, se desprende que él está familiarizado con el Silvadene ya que forma parte de muchas de las heridas que maneja a diario.

137. El Dr. Guiot testificó que el Silvadene es un antibiótico tópico que se utiliza en quemaduras y en heridas, cuyo propósito es mantener el área libre de bacterias para que pueda sanar sin que haya un proceso infeccioso que altere el proceso de cicatrización.

138. Según el testimonio del Dr. Guiot, se recomienda limpiar la herida con agua y jabón, además de usar de un antibiótico tópico.

139. El Dr. Guiot testificó que en el prospecto ("package insert") del Silvadene, que es el documento que brinda las indicaciones y contraindicaciones, según especificado por la FDA, no menciona un periodo específico después del cual el producto está contraindicado, como testificó la Sra. Abrams, quien adujo que está contraindicado utilizar el Silvadene por más de dos (2) semanas.

140. El Dr. Guiot testificó que el Santyl es un producto que contiene colagenasa, es decir, que rompe el colágeno, y el cual es un desbridador químico. El Santyl desbrida el tejido que está muerto, pero puede tener efecto en el tejido viable.

141. El Dr. Guiot testificó que el Santyl está indicado para úlceras crónicas o quemaduras severas. Una herida que no haya sanado por más de tres (3) meses se considera crónica.

142. Según se desprende del testimonio del Dr. Guiot, debido a que el Santyl es un producto que enzimáticamente desbrida la herida, la introducción y el uso prolongado del mismo en la Sra. Martínez, ocasionó la apertura de la herida

el 5 de enero de 2017, con los cambios adicionales que manifestó la paciente durante ese evento.

143. El Dr. Guiot testificó que el proceso de cicatrización es complejo y conlleva tiempo. Para que una herida quirúrgica cicatrice tiene que pasar por varias etapas: primero, ocurre un proceso de inflamación, seguido por un proceso en el que surge tejido de granulación y epitelio nuevo, que va generando esa herida y; tercero, ocurre un proceso de madurez, donde el colágeno se madura y se endurece. Si se remueve prematuramente la cáscara que está cubriendo la herida antes de que ocurra el proceso de crear epitelio, que es el tejido nuevo que se produce para rellenar la herida, y previo al proceso de madurez, la herida no va a sanar de adentro hacia afuera, que es el proceso natural, sino que ese tejido que queda abierto cicatrizará de una forma atípica o anormal. Por ello, el Dr. Guiot concluyó que el aspecto final del seno de la Sra. Martínez fue causado por haber removido con un desbridador químico la capa que cubría la herida de la Sra. Martínez, máxime cuando el tejido del seno es mucho más delicado que el tejido de otras partes del cuerpo.

144. El Dr. Guiot testificó que las bacterias Proteus Mirabilis y Escherichia Coli se consideran Gram negativas y son bacilos, lo que significa que se ven en forma de bastón cuando se ven a través de un microscopio. Son bacterias que comúnmente se encuentran en el tracto intestinal del humano, por lo que son bacterias endógenas. La causa más común de que esas bacterias estuvieran en el seno izquierdo de la Sra. Martínez es que hayan surgido de la propia paciente, pues no son bacterias exógenas.

145. El Dr. Guiot testificó que las bacterias Proteus Mirabilis y Escherichia Coli se encontraban en el seno izquierdo de la Sra. Martínez debido a una colonización, lo que significa que estaban presentes, que pudieron haber surgido del cultivo, pero que no estaban causando infección. Llegó a dicha conclusión ya que el cultivo de la bacteria Proteus Mirabilis refleja que el crecimiento fue poco ("few") y en el caso de la bacteria Escherichia Coli fue "scant". Cuando hay una infección real, se suelen cultivar estas bacterias en mayor volumen. O sea, se esperaría que el crecimiento de esas bacterias sea "moderado" o "abundante".

146. El Dr. Guiot testificó que cuando hay una infección real, el líquido que se manda a cultivar de la herida suele ser francamente purulento. En el caso de la Sra. Martínez, el líquido se describió como seropurulento.

147. El Dr. Guiot testificó que cuando hay una infección real, los glóbulos blancos en el líquido tienden a ser abundantes y en el caso de la Sra. Martínez hubo pocos glóbulos blancos en las secreciones.

148. El Dr. Guiot testificó que en las infecciones de heridas quirúrgicas se tiende a ver bacterias Gram positivas, exógenas y con un perfil de resistencia aumentado. Es decir, son bacterias que son resistentes a la mayoría de los antibióticos.

149. El Dr. Guiot testificó que la bacteria Proteus Mirabilis que se cultivó en la muestra de la Sra. Martínez es sensitiva a todos los antibióticos a los cuales se le hizo resistencia. Por otro lado, la bacteria Escherichia Coli es resistente a solo dos (2) antibióticos. Asimismo, ambas bacterias son Gram negativas y son endógenas. Por consiguiente, el Dr. Guiot concluyó que, de un análisis de las características del líquido, del perfil y crecimiento de las bacterias, así como de los signos y síntomas de la Sra. Martínez, se desprende que las bacterias Proteus Mirabilis y Escherichia Coli no estaban causando ninguna infección.

Inconforme, el 16 de mayo de 2024, los Apelantes presentaron una solicitud de reconsideración del dictamen. Sin embargo, esta fue rechazada de plano por el TPI el mismo día que fue presentada.

Insatisfechos aún, el 30 de mayo de 2024, los Apelantes recurrieron ante este foro vía recurso de *Apelación* y señalaron los siguientes errores:

> **Primer Señalamiento de error**: El Tribunal de Primera Instancia incurrió en abuso de discreción y en error manifiesto, prejuicio y parcialidad en la apreciación de la prueba desfilada en el juicio al otorgar entera credibilidad al testimonio de la demandada, Dra. Kathia Alejando Serrano, a pesar de (i) la falta de documentación crasa en que incurrió la Dra. Alejandro, (ii) la ausencia de información en los expedientes médicos relacionados al tratamiento que le brindó a la Sra. Luz E. Martínez Morales, (iii) múltiples testimonios bajo juramento que contradicen el testimonio de la Dra. Alejandro, y (iv) la prueba documental admitida que contradice y/o pone en duda el testimonio de la Dra. Alejandro.
>
> **Segundo Señalamiento de error**: El TPI incurrió en abuso de discreción al no aplicar correctamente el derecho positivo vigente en Puerto Rico que regula la materia de reclamaciones de daños y perjuicios por causa de impericia médica, ya que, en su función adjudicativa, (i) no utilizó los criterios que establece la Regla 702 de Evidencia para adjudicar valor probatorio de los testimonios periciales; (ii) no estimó, ni consideró, el estándar aceptado en la práctica de la cirugía para realizar mamoplastías de reducción en pacientes, no oncológicos, con las características físicas de la demandante, la Sra. Luz E. Martínez Morales, según lo establecido por medio del testimonio del perito de la parte demandante, el Dr. Roberto Méndez López; y (iii) omitió relacionar correctamente los hechos ocurridos conforme demostrados en el juicio.
>
> **Tercer Señalamiento de Error**: El TPI incurrió en abuso de discreción, ya que su apreciación de la prueba no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba presentada en este caso, debido a que descartó injustificadamente elementos probatorios importantes y fundó su criterio en testimonios improbables o imposibles, en particular, el de la Dra. Kathia Alejandro.
>
> **Cuarto Señalamiento de Error**: El TPI incurrió en abuso de discreción al omitir en sus determinaciones de hechos, o no darle el peso probatorio que ameritan, a una serie de importantes hechos materiales que fueron demostrados durante el juicio por medio de los testimonios de los demandantes, Luz E. Martínez Morales, Abigaíl Quiñones Pietri y Alexis Quiñones Martínez, de la testigo, Lorraine Monroig, de la demandada, Dr. Kathia Alejandro, de la Sra. Myrna Abrams Valle, perito de ocurrencia y testigo de la parte demandante, y por medio del contenido del propio expediente médico de la Sra. Luz E. Martínez Morales en las oficinas de la Dra. Kathia Alejandro y en Doctors' Center Hospital de Manatí, ambos estipulados y admitidos en evidencia.
>
> **Quinto Señalamiento de Error**: El TPI incurrió en abuso de discreción al tomar conocimiento personal de múltiples hechos extrajudiciales sin que se hubiese desfilado prueba que sustentara los mismos, y al determinar que la parte

demandante desistió de alegaciones contra la demandada, Dra. Kathia Alejandro Serrano, dirigida a impugnar su capacidad y cualificaciones para realizar mamoplastías de reducción de senos en pacientes no oncológicos, obstaculizando así a que la parte demandante pudiese presentar prueba dirigida a establecer dichas alegaciones.

Luego de varios incidentes procesales relacionados a la transcripción de la prueba oral, el 29 de enero de 2025, la Dra. Alejandro presentó su *Alegato en Oposición a la Apelación.*

Así, con el beneficio de la comparecencia de ambas partes y, examinados sus escritos, así como el legajo apelativo, procedemos a resolver.

**II.**

**-A-**

Es norma reiterada el ejercicio discrecional de la apreciación de la prueba que ejerce el TPI y las determinaciones que realiza están revestidas de confiabilidad y merecen respeto y deferencia[3]. Por ello, la valoración que lleva a cabo el foro primario se presume correcta, toda vez que es este quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos, así como sus lenguajes no verbales[4]. Por su parte, un foro apelativo cuenta solamente con "récords mudos e inexpresivos", por lo que se le debe respeto a la adjudicación de credibilidad realizada por el juzgador primario de los hechos[5]. En ese sentido, y como regla general, no debemos intervenir con las determinaciones que este haya efectuado en virtud de la presunción de corrección de la que gozan[6].

**En vista de lo anterior, nuestro máximo foro ha resuelto que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias**

---

[3] *Pueblo v. Pérez Núñez*, 208 DPR 511, 529 (2022); *Argüello v. Argüello*, 155 DPR 62, 79 (2001) (citando a *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987)); *Trinidad v. Chade*, 153 DPR 280, 291 (2001).

[4] *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013); *Pueblo v. Santiago*, 176 DPR 133, 148 (2009); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

[5] *Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 177 DPR 345, 356 (2009); *Trinidad v. Chade, supra*, pág. 291.

[6] *Pueblo v. Pérez Núñez, supra*, pág. 529.

**extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto, o cuando un análisis integral de la prueba así lo justifique**[7]. En consecuencia, cuando este tribunal apelativo se enfrente a la tarea de revisar las determinaciones del foro de instancia, no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad efectuadas por el mismo, excepto en aquellas situaciones en que se demuestre que este último: (i) actuó con prejuicio o parcialidad, (ii) incurrió en un craso abuso de discreción, o (iii) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo[8].

Con relación al error manifiesto, un juzgador incurre en este cuando de un análisis de la totalidad de la evidencia, este Tribunal queda convencido de que las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida[9]. Por tanto, debe existir base suficiente en la prueba admitida que apoye la determinación del foro[10].

De igual forma, se podrá intervenir con la determinación del TPI cuando la referida valoración se aparte de la realidad fáctica o resulte inherentemente imposible o increíble; de lo contrario, el tribunal apelativo deberá abstenerse de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos[11].

**Ahora bien, cabe destacar que el Tribunal Supremo ha resuelto que en instancias en que las conclusiones de hecho que**

---

[7] *Pueblo v. Calderón Álvarez,* 140 DPR 627, 644 (1996); *Coop. Seguros Múltiples de P.R. v. Lugo,* 136 DPR 203, 208 (1994); *Rivera Pérez v. Cruz Corchado*, 119 DPR 8, 14 (1987); S*ierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).
[8] *González Hernández v. González Hernández*, 181 DPR 746, 776 (2011); *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000); *Pueblo v. Irizarry*, 156 DPR 780, 789 (2002); *Pueblo v. Maisonave*, 129 DPR 49, 62-63 (1991).
[9] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 772 (2013).
[10] *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018); *Pueblo v. Irizarry, supra.*
[11] *Santiago Ortiz v. Real Legacy et al.*, *supra*; *Pueblo v. Arlequín Vélez,* 204 DPR 117, 148 (2020); *Pueblo v. Martínez Landrón*, 202 DPR 409, 424 (2019) (citando a *Pueblo v. Maisonave, supra*, pág. 63); *González Hernández v. González Hernández, supra*, 777; *Pueblo v. Viruet Camacho*, 173 DPR 563, 584 (2009); *Pueblo v. Irizarry, supra*; *Pueblo v. Acevedo Estrada, supra.*

**realice el TPI estén basadas en prueba pericial o documental, un tribunal revisor estará en la misma posición que el tribunal *a quo*** [12]. Por tanto, ante dichas instancias, este tribunal apelativo "tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta" [13].

A esos efectos, aunque no está exenta de la posibilidad de toda revisión, si la actuación del tribunal a *quo* no está desprovista de base razonable ni perjudica los derechos sustanciales de una parte, lo lógico es que prevalezca el criterio del TPI a quien corresponde la dirección del proceso [14]. Los foros apelativos podremos intervenir con tal apreciación luego de realizar una evaluación rigurosa y que, de esta, surjan serias dudas, razonables y fundadas [15].

Las decisiones discrecionales que toma el TPI no serán revocadas a menos que se demuestre que ese foro abusó de su discreción [16]. Un tribunal de justicia incurre en un abuso de discreción: (i) cuando el juez no toma en cuenta e ignora en la decisión que emite, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; (ii) cuando el juez, por el contrario, sin justificación ni fundamento alguno, concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en éste; o, (iii) cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez los sopesa y calibra livianamente [17].

A su vez, es una norma bien establecida de nuestro sistema de justicia que la discreción judicial permea la evaluación de la

---

[12] *González Hernández v. González* Hernández, *supra*; *Sepúlveda v. Depto. de Salud*, 145 DPR 560, 573 (1998).

[13] *González Hernández v. González* Hernández, *supra*; *Mun. de Loíza v. Sucns. Suárez et al.*, 154 DPR 333, 363 (2001); *Prieto v. Maryland Casualty Co.*, 98 DPR 594, 623 (1970).

[14] S*ierra v. Tribunal Superior, supra*.

[15] *Pueblo v. Pérez Núñez, supra*.

[16] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434 (2013); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009).

[17] *Pueblo v. Rivera Santiago, supra*.

evidencia presentada en los casos y controversias[18]. No obstante, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal revisor[19]. A esos efectos, conviene destacar que, la intervención del foro apelativo con la prueba desfilada tiene que estar basada en un **análisis independiente** y no a base de los hechos que exponen las partes[20].

## -B-

La responsabilidad civil extracontractual por actos de mala práctica de la medicina debido a la impericia o negligencia de un galeno surge del Art. 1802 del Código Civil de 1930.[21] Dicha norma reza de la siguiente manera: "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado"[22]. Así, para imponer responsabilidad bajo el Art. 1802 a un profesional de la medicina por impericia, es necesaria la concurrencia de los siguientes requisitos: (1) la existencia de un daño sufrido; (2) un acto u omisión culposo o negligente, y (3) un nexo causal entre el daño y la referida acción culposa o negligente[23].

Todo ser humano tiene un deber de cuidado que consiste en la obligación de anticipar el peligro de ocasionar daños cuya probabilidad es razonablemente previsible[24]. Ahora bien, existe un deber de cuidado médico exigible a los galenos el cual requiere que el médico "brinde a sus pacientes aquella **atención médica que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y práctica**

---

[18] *González Hernández v. González Hernández, supra,* pág. 776.
[19] *Rivera Pérez v. Cruz Corchado, supra.*
[20] *Hernández v. San Lorenzo Const.*, 153 DPR 405, 425 (2001).
[21] CÓD. CIV. PR art. 1802, 31 LPRA secc. 5141 (1930) (derogado). La normativa sustantiva aplicable al caso de marras corresponde al Código Civil derogado toda vez que los hechos ocurrieron durante la vigencia de dicho cuerpo normativo.
[22] *Íd.*
[23] *Monllor v. Soc. de Gananciales,* 138 DPR 600, 604 (1995); *Hernández v. Fournier,* 80 DPR 93, 96-97 (1957).
[24] *López v. Dr. Cañizares,* 163 DPR 119, 132 (2004).

**prevalecientes de la medicina, satisfaga las exigencias generalmente reconocidas por la propia profesión médica**"[25].

Por otra parte, al evaluar una causa de acción por impericia médica debemos tener presente que a los médicos los cobija una presunción de haber ejercido un grado razonable de cuidado y haber ofrecido un tratamiento adecuado[26]. Esto es así porque al médico se le reconoce una amplia discreción en el cuidado de un paciente. No incurre en responsabilidad el médico que ante las circunstancias particulares usa su buen juicio profesional, enmarcado en los límites de lo razonable y aceptable para muchos sectores de la profesión médica[27]. De tal manera, "**[p]ara rebatir esta presunción, la parte demandante no puede descansar en una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional**"[28]. El estándar probatorio para rebatir dicha presunción es el de preponderancia de la prueba[29]. Así, **un reclamante debe demostrar que el médico fue negligente y que dicha conducta negligente fue el factor que con mayor probabilidad causó los daños para rebatir la presunción de corrección del médico**[30].

**Es requisito ineludible que el reclamante rebata la presunción que favorece al médico a través de prueba pericial**[31]. Como puede observarse, en los casos de impericia médica, el *quantum* probatorio de preponderancia de la prueba es más riguroso que el de una acción ordinaria por daños y perjuicios al amparo del Art. 1802, ya que la prueba pericial resulta ser un elemento

---

[25] *Arrieta v. De la Vega*, 165 DPR 538, 549 (2005) (énfasis suplido). Véase, *López v. Cañizares*, *supra*, pág. 133 (2004); *Sepúlveda de Arrieta v. Barreto*, 137 DPR 735, 759 (1994); *Oliveros v. Abréu*, 101 DPR 209 (1973).

[26] *Arrieta v. De la Vega*, *supra*, pág. 549. Véase, *López v. Cañizares*, *supra*, pág. 134; *Rodríguez Crespo v. Hernández*, 121 DPR 639 (1988).

[27] *Río Ruiz v. Mark*, 119 DPR 816, 820-821 (1987); *Lozada v. ELA*, 116 DPR 202 (1985).

[28] *Arrieta v. De la Vega*, *supra*, págs. 549-550 (énfasis suplido).

[29] *López v. Cañizares*, *supra*, págs. 134-135; *Rodríguez Crespo v. Hernández*, *supra*.

[30] *Rivera v. ELA*, 99 DPR 890, 899 (1971).

[31] *López v. Cañizares*, *supra*, pág. 133.

enormemente influyente, aunque no decisivo[32]. Conforme a la normativa vigente, **para establecer un caso *prima facie* de impericia médica se tiene que presentar prueba pericial sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) demostrar que esta fue la causa de la lesión sufrida por el paciente**[33].

**-C-**

Una causa interventora se define como aquella que "desaparece un mal anterior como la causa próxima del accidente rompiendo la secuencia entre el mal anterior y los daños sufridos"[34]. "La prueba de la suficiencia de la causa interventora no es el mero hecho de su existencia sino su naturaleza y la manera en que afecta la continuidad de la operación de la primera causa y la única en ella y los daños alegados"[35]. Por ende, "[u]na causa interventora es aquella que desaparece un mal anterior como la causa próxima del accidente rompiendo la secuencia entre el mal anterior y los daños sufridos"[36]. Por lo cual, **"[c]uando la línea de causalidad ha sido interrumpida por la intervención de alguna causa eficiente e independiente, esa causa interventora** debe ser aceptada como la causa próxima"[37].

En cuanto a la doctrina de causa interventora como eximente de responsabilidad ocurre cuando el primer acto negligente es tan solo una circunstancia de los hechos que dieron ocasión a los daños y no la causa próxima y directa del accidente[38]. En fin, "[l]a causa

---

[32] Véase, *Cirino Vizcarrondo v. Clínica Gubern*, 129 DPR 977, 1003 (1992).
[33] *López v. Cañizares*, *supra*, pág. 134; *Rodríguez Crespo v. Hernández*, *supra*, págs. 650.
[34] *Ginés Meléndez v. Autoridad de Acueductos*, 86 DPR 518, 522 (1962) citando al *American Law Report*, 66 A.L.R.1121.
[35] *Íd.*, 13 A.L.R. 1268.
[36] *Íd.*, 66 A.L.R. 1121.
[37] *Andino v. Central Victoria, Inc.*, 57 DPR 310, 319 (1940).
[38] *Ginés Meléndez v. Autoridad de Acueductos, supra*, pág. 522.

interventora ha de ser independiente, suficiente y adecuada para causar los daños resultantes"[39].

Por último, el Tribunal Supremo en *Ginés Meléndez v. Autoridad de Acueductos, supra*, a la pág. 523, expuso:

> Una causa interventora, ... es aquella que participa activamente en producir el resultado después que ha ocurrido la negligencia u omisión del actor. Ordinariamente un demandado no queda relevado de responsabilidad por una causa interventora que razonablemente pudo ser prevista, ni por una que sea un incidente normal del riesgo creado. Por el contrario, y como principio general, un demandado será relevado de responsabilidad por una causa interventora imprevisible y anormal que produce un resultado que no pudo ser previsto. La regla general en las jurisdicciones americanas es que el mero hecho de que haya un acto de un tercero interventor no convierte la actuación del actor en una causa remota, si [e]ste pudo o debió haber previsto esta intervención. [citas omitidas]"

### III.

En síntesis, los Apelantes arguyen en su recurso, que el TPI incidió en su apreciación de la prueba al otorgar entera credibilidad al testimonio de la Dra. Alejandro y al conferir mayor valor probatorio al testimonio pericial presentado por la galena. De tal manera, argumentan que el TPI aplicó erróneamente el derecho aplicable a los hechos materiales del caso.

En cambio, la galena replica que, luego de desfilada la prueba testifical, documental y pericial, los Apelantes no pudieron probar que la Dra. Alejandro se haya apartado del estándar establecido por la profesión médica ni que el tratamiento médico brindado a la Sra. Martínez haya sido incorrecto, inadecuado o le haya causado daños. Por tal razón, nos suplica que prestemos deferencia a las determinaciones del TPI y confirmemos su dictamen.

Por estar intrínsecamente relacionados, discutiremos los señalamientos de error en conjunto. A diferencia del TPI, nos

---

[39] *Íd.*

corresponde evaluar si procede o no la aplicación de la doctrina de causa interventora. Veamos.

Surge de la *Sentencia* apelada que, el TPI otorga entera credibilidad al testimonio vertido por la Dra. Alejandro en el juicio en su fondo. Como regla general, las determinaciones de hecho del TPI están revestidas de confiabilidad y merecen respeto y deferencia[40]. Al respecto, nuestro máximo foro judicial ha resuelto que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto, o **cuando un análisis integral de la prueba así lo justifique**[41].

Tras realizar un análisis integral de la totalidad de la prueba, nos lleva a concluir que el TPI erró al otorgar entera credibilidad al testimonio vertido por la Dra. Alejandro en el juicio en su fondo. A continuación, esbozamos las tres razones principales para ello.

Primero, surge del legajo apelativo que la Dra. Alejandro no tomó notas preoperatorias sobre las medidas de los senos de la Sra. Martínez, esto es un hecho incontrovertido, pues queda establecido tanto del testimonio de la galena como del de la Sra. Martínez[42]. A pesar de que el TPI concluyó que la Dra. Alejandro le midió y marcó los senos a la paciente antes de realizar la cirugía, es también un hecho incontrovertido que estas medidas no constan en el récord médico de la paciente[43]. Esta omisión es significativa, puesto que, la ausencia de un récord médico adecuado imposibilita a este tribunal determinar a base de la prueba pericial, cuál técnica de cirugía

---

[40] *Pueblo v. Pérez Núñez, supra*, pág. 514; *Argüello v. Argüello, supra*, pág. 79 (citando a *Pueblo v. Bonilla Romero, supra*, pág. 111); *Trinidad v. Chade, supra*, pág. 289.
[41] *Pueblo v. Calderón Álvarez, supra*, pág. 644; *Coop. Seguros Múltiples de P.R. v. Lugo, supra*, pág. 208; *Rivera Pérez v. Cruz Corchado, supra*, pág. 14; S*ierra v. Tribunal Superior, supra*, pág. 572.
[42] SUMAC, Entrada Núm. 437, Sentencia apelada, pág. 51.
[43] TPO, págs. 632-633.

hubiese sido la correcta[44], y a su vez, impide a este Foro Intermedio adoptar su propio criterio en la apreciación y evaluación de la prueba pericial[45], y hasta para descartarla, aunque resulte técnicamente correcta. **Como advertimos, la falta de un expediente médico adecuado nos priva de conocer el raciocinio que tuvo la Dra. Alejandro al tomar la decisión de la técnica a utilizar**.

Segundo, la Dra. Alejandro admitió que durante la primera evaluación post operatoria de la Sra. Martínez el 26 de octubre de 2016, la paciente se quejó de que su pezón izquierdo estaba negro[46]. A preguntas en el juicio en su fondo de por qué no apuntó la queja de la paciente, contestó que no anotó nada al respecto *"[p]orque cuando yo la chequeé no tenía el pezón negro"*[47]. No obstante, la galena documentó en el *Breast Surgery Progression Note* lo siguiente: "Patient feeling well, no complaints"[48] aun cuando admite que la Sra. Martínez se quejó del punto negro en el pezón. Así que, reiteramos que la falta de certeza en el récord médico coloca a este foro intermedio en una posición frágil para determinar si luego de la operación hubo una complicación de la necrosis en el complejo pezón-areola. Puesto que, en la literatura médica traída por la prueba pericial, se expresa que *"[n]ecrosis of the nipple is a dreaded complication. . . . A meticulous observation of the areolar circulation in the first 48 hours would warn about this complication. If persistent*

---

[44] TPO, págs. 290, 294, 295, 321, 615. En este asunto, debemos destacar que el Tribunal Supremo ha resuelto que **en instancias en que las conclusiones de hecho que realice el TPI estén basadas en prueba pericial o documental, un tribunal revisor estará en la misma posición que el tribunal *a quo.*** *González Hernández v. González* Hernández, *supra*; *Sepúlveda v. Depto. de Salud, supra*, pág. 573. Por tanto, ante dichas instancias, este tribunal apelativo "tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta". *González Hernández v. González Hernández, supra*; *Mun. de Loíza v. Sucns. Suárez et al.*, *supra*, pág. 363; *Prieto v. Maryland Casualty Co.*, *supra*, pág. 623.

[45] *González Hernández v. González* Hernández*, supra*; *Mun. de Loíza v. Sucns. Suárez et al.*, *supra*, pág. 363; *Prieto v. Maryland Casualty Co.*, *supra*, pág. 623.

[46] TPO, pág. 321.

[47] TPO, pág. 321. Cabe resaltar que, a preguntas sobre cómo verificó el color del complejo pezón-areola, la Dra. Alejandro admitió que retiró el vendaje y miró momentáneamente a la paciente. Véase, TPO, pág. 326.

[48] TPO, pág. 321; Apéndice, pág. 406.

*cyanosis is noticed, identification of the problem and immediate intervention in the operating room might salvage the nipple"*[49]. Es decir, una necrosis alerta sus señales ya desde las primeras 48 horas de su causa y son observables en forma de cianosis. Además, el perito de la galena, Dr. Arboleda, admitió que un cirujano que hace una mamoplastía de reducción debe anotar las quejas de su paciente luego de su primera evaluación[50], lo cual no ocurre en el caso de autos.

Tercero, las lagunas en el expediente médico proliferan. A manera de ejemplo, nada consta en los récords médicos sobre que el 2 de noviembre de 2016 durante la primera cita post operatoria de la Sra. Martínez, la Dra. Alejandro haya percibido el complejo pezón-areola del seno izquierdo de color azuloso o gris, a pesar de que testificó en el juicio que ella notó el color y que anticipaba que tendría problemas de necrosis[51]. Al respecto, el perito de la galena, el Dr. Humberto Guiot Martínez (Dr. Guiot), testificó que este asunto debió documentarse, por requerir seguimiento y posible tratamiento especial[52]. Asimismo, otra importante omisión en el récord médico es que en el formulario *Breast Surgery, Evaluation and Management – H&P,* realizado en la visita inicial del 2 de marzo de 2016, no hay nada anotado sobre explicaciones hechas a la paciente de su diagnóstico, procedimiento, riesgos o prognosis[53]. Tampoco hizo apunte alguno en los encasillados que provee el formulario de la evaluación, a pesar de que, entre los encasillados, se encuentra uno que dice "Old scars" y la Sra. Martínez tenía una cicatriz en el seno izquierdo al momento de la evaluación hecha por la galena[54]. El

---

[49] Lakshmi Saleem, Jerry R. John, *Unfavourable results following reduction mammoplasty,* Indian J. Plast. Surg. 2013 May-Aug; 46(2): 401–407.
[50] TPO, págs. 641-642.
[51] TPO, págs. 327-329.
[52] TPO, pág. 690.
[53] Apéndice, pág. 353.
[54] TPO, pág. 295. Cabe resaltar que, de la literatura médica traída por la prueba pericial, surge que una cicatriz previa en el complejo pezón-areola ("Previous scars around the NAC") es un factor que aumenta la complicación de la necrosis en el complejo pezón-areola. Alberto Rancati, Marcelo Irigo, Claudio Angrigiani,

propio Dr. Arboleda, perito de la galena, afirmó en el juicio que se tenía que documentar tal cicatriz[55].

Es un hecho indubitado que la falta de un expediente médico completo o adecuado en varias etapas del proceso <u>minan la credibilidad de la Dra. Alejandro.</u>

Por esta razón, entendemos que el primer y cuarto señalamiento de error traídos por los Apelantes sí se cometieron. Esto es, el TPI incurrió en un error manifiesto al otorgar credibilidad al testimonio de la Dra. Alejandro. Ciertamente, aun cuando dichos errores fueron cometidos, los mismos no son perjudiciales, ni tienen el efecto de invalidar el dictamen apelado.

Nótese que, aunque prestemos mayor valor probatorio al testimonio del perito Dr. Méndez sobre el "riesgo mayor" en que se incurre al utilizar la técnica superomedial para levantar el pedículo por más de 10 centímetros, **no hay prueba en el expediente que afirme que el factor de riesgo del desplazamiento mayor de 10 centímetros fue la causa adecuada de los daños sufridos por la Sra. Martínez**. Asimismo, **no hay prueba en el legajo para afirmar que este factor de riesgo representó un verdadero riesgo irrazonable de desarrollo de necrosis lo suficiente como para inferir un acto culposo por parte de la Dra. Alejandro**. Más bien, los peritos de ambas partes están de acuerdo que, en general, en condiciones normales y sin mediar factores de riesgo, la necrosis del complejo pezón-areola es una complicación "rara" y remota de una mamoplastía de reducción, que solo ocurre entre 1-2% de los pacientes que se someten a dicha cirugía, y que la misma puede ocurrir en cualquier diseño, pedículo o técnica operatoria que se utilice para una reducción de seno[56].

---

*Management of the Ischemic Nipple-Areola Complex After Breast Reduction,* Clin. Plast. Surg. 2016 Apr; 43(2): 403-14.
[55] TPO, págs. 586-587, 594.
[56] TPO, págs. 407, 548.

Es norma establecida por nuestro Máximo Foro Judicial que **la relación de causalidad no puede basarse en especulaciones**, sino, al igual que en todo caso civil de daños y perjuicios, por la preponderancia de la evidencia[57]. En otras palabras, **el demandante debe probar, mediante la preponderancia de la prueba, que <u>las acciones negligentes del demandado fueron el factor que con mayor probabilidad ocasionó el daño sufrido; no basta con meras posibilidades</u>**[58]. Aunque también nuestra jurisprudencia señala que no es necesario establecer ese hecho con precisión matemática ni tampoco eliminar toda otra posible causa de daño[59].

**Aquí, el perito Méndez se limitó a testificar que haber utilizado la técnica superomedial implicó un "riesgo mayor de lo usual" para la Sra. Martínez sin adentrarse en si la técnica fue la causa que con más probabilidad causó la necrosis y el eventual daño sufrido**. No hay una base porcentual ni de probabilidad que nos permita hacer tal juicio. La Sra. Martínez no nos coloca en condiciones para analizar y determinar si la Dra. Alejandro la sometió a un riesgo irrazonable representativo de un acto culposo o negligente al utilizar la técnica superomedial. De tal manera, determinamos que los Apelantes no lograron establecer bajo preponderancia de la prueba que utilizar tal técnica fue la causa de la lesión. Por tanto, determinamos que los errores enumerados segundo, tercero y quinto, no fueron cometidos.

Ahora bien, en el caso de autos, ocurrió una causa interventora imprevisible y anormal que produce un resultado que no pudo ser previsto[60].

---

[57] *Zambrana v. Hospital Santo Asilo de Damas*, 109 DPR 517, 521 (1980).
[58] *Íd.*
[59] *Íd.*
[60] *Ginés Meléndez v. Autoridad de Acueductos*, 86 DPR 518, 523 (1962).

Es un hecho cierto que, el tratamiento post operatorio que brinda la Dra. Alejandro fue adecuado al estándar de cuidado médico pertinente. Indubitadamente, la Dra. Alejandro recomendó un tratamiento correcto, el cual la paciente no siguió a cabalidad. Fíjese que, en la primera cita de seguimiento post operatoria, el 2 de noviembre de 2016, la Dra. Alejandro observó que el pezón izquierdo tenía un color azuloso gris, por lo cual, le recetó a su paciente *Silvadene* y la instruyó a lavarse el área del complejo pezón-areola con agua y jabón antibacterial sin perfume[61]. Tras un estudio detenido del testimonio de la Sra. Martínez, colegimos que, no merece credibilidad en cuanto a que la instrucción de la galena fue que se lavara con agua oxigenada y jabón *protex*. Según se desprende de la prueba documental y de lo vertido en el juicio en su fondo, la Dra. Alejandro consistentemente recomendó el mismo tratamiento. Sin embargo, el 30 de noviembre de 2016, la Sra. Martínez **optó por cambiar** el tratamiento y comenzó a utilizar Santyl y gel Duoderm en lugar de *Silvadene*, esto, sin la intervención de la Dra. Alejandro[62]. Ante este escenario, el 5 de enero de 2017, el complejo pezón-areola de la Sra. Martínez colapsó y comenzó a botar sangre y secreciones mal olientes.

Destacamos que, los peritos de ambas partes estuvieron de acuerdo con que el tratamiento provisto por la Dra. Alejandro fue el correcto[63]. No obstante, el perito Dr. Arboleda testificó que **el manejo de la herida de la Sra. Martínez con Santyl, recomendado por la enfermera Sra. Abrams, fue uno inadecuado porque provoca químicamente que la escara se caiga antes de tiempo y no permite sanar de adentro hacia afuera**[64]. **Lo mismo testificó el Dr. Guiot**[65]. En la literatura médica traída en el juicio,

---

[61] TPO, pág. 328.
[62] TPO, pág. 94.
[63] TPO, págs. 426, 562-563.
[64] TPO, pág. 566.
[65] Véase, TPO, pág. 666.

se advierte sobre el tratamiento que debe recibir el complejo pezón-areola en los casos donde las señales de isquemia no se perciban durante las primeras seis u ocho horas luego de la cirugía, como sucedió en este caso. Al respecto, en *Management of the Ischemic Nipple-Areola Complex After Breast Reduction* los autores expresan que *"[i]n these cases, conservative wound care is indicated, and secondary healing is the best option"*[66].

Ahora bien, no se desfiló prueba alguna sobre si la galena fue negligente al no percibir las señales de isquemia en las primeras seis u ocho horas post operatorias ni se trajo a colación en la *Apelación*.

Por tales razones, afirmamos que, aunque otorguemos credibilidad a la Sra. Martínez en cuanto a que observó su pezón oscuro y que la Dra. Alejandro no lo tomó con la seriedad que ameritaba, nuestro análisis no queda modificado por tal hecho.

Cónsono con lo anterior, no estamos en posición de sentenciar que el tratamiento o la falta de tratamiento de la Dra. Alejandro fue el factor que con mayor probabilidad causó el daño a la Sra. Martínez, máxime, cuando hay otras causas, que rompen cualquier nexo causal que pudiese existir entre las condiciones antes descritas y el daño. Cónsono con lo anterior, la doctrina de causa interventora

---

[66] Alberto Rancati, Marcelo Irigo, Claudio Angrigiani, *supra*. Además, en estos casos, los autores recomiendan el siguiente curso:

> In the case of more than 8 hours of NAC ischemia, consider it as an established damage. In this scenario, wound care management can be done mechanically, enzymatically, or surgically. Nonvital tissue must be removed, and the changing dressings twice a day is recommended to reduce bacterial contamination and promote quick granulation and reepithelialization. We suggest the following course of treatment.
>
> *Initial Treatment*
> *First 30 days*
> - Close personal contact with patient.
> - Silver iron cream dressings with Atb.
> - Surgical wound debridement of nonviable surrounding tissues.
> - Autolytic agents, Iruxol N or collagenase creams.
>
> *After Debridement of All Necrotic Tissue*
> *After 30 days*
> - Personal office follow-up, with weekly picture documentation in chart.
> - Protease modulating agents, that is, Hydrogel and Alginate cream (moist environment to speed healing).

es de aplicación al caso de autos y se cumplen con los cinco (5) requisitos a saber: el segundo acto u omisión con relación al acto original: (1) imprevisto; (2) el cual fue posterior al acto original; (3) independiente de éste; (4) un acto consciente, intencional o antijurídico; y (5) por sí suficiente y adecuado para causar los daños. Dado el cumplimiento obvio e inequívoco con todos los requisitos, es inevitable concluir que optar por el cambio de tratamiento constituye una causa interventora que rompe cualquier nexo causal entre las acciones y omisiones de la galena, según la evidencia presentada al tribunal *a quo*, y la pérdida del pezón y areola.

Reiteramos lo expresado por nuestro Tribunal Supremo, que "[c]orresponde al demandante probar, mediante preponderancia de la prueba, que el tratamiento ofrecido por el demandado fue el factor que con mayor probabilidad ocasionó el daño, y establecer además el vínculo causal requerido por el Art. 1802 del Código Civil"[67]. Además, reafirmamos lo dispuesto por la Alta Curia:

> No es función de este Tribunal prescribir tratamientos médicos. Comprendemos que cada paciente puede presentar circunstancias particulares que hagan que un tratamiento específico sea o no sea recomendable. También reconocemos que toda cura médica conlleva cierto tipo de riesgo de alguna clase. Por esta razón hemos reconocido la necesidad de que los médicos hagan uso de su criterio profesional informado enriquecido con la experiencia y la madurez —en la doctrina de que un error honesto de juicio no genera responsabilidad. Ello no significa una renuncia del foro judicial a su función adjudicativa de determinar en cada caso individual si la actuación del profesional es razonable, a tenor con el estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, y si genera responsabilidad[68].

Además, *"[s]i de la evidencia surgen varias causas probables del daño, no puede imponérsele responsabilidad al médico, a menos que del examen de la totalidad de la prueba surja de que su actuación negligente es la que mayores probabilidades tiene de haber causado*

---

[67] *Río Ruiz v. Mark, supra,* pág. 821.
[68] *Cruz v. Centro Médico de PR,* 113 DPR 719, 736 (1983).

*el daño"*[69]. Por tal razón, disponemos que, el cuatro error no fue cometido.

**IV.**

Por los fundamentos antes expuestos, ***confirmamos*** la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[69] *Medina Vda. De López v. ELA*, 104 DPR 178 (1975); *Reyes v. Phoenix Assurance Co., supra*, pág. 876; *Rivera v. ELA, supra*, págs. 898-899.